Slip Op. 20– 115

UNITED STATES COURT OF INTERNATIONAL TRADE

---

|  |  |  |
|---|---|---|
| WILMAR TRADING PTE LTD., PT WILMAR BIOENERGI INDONESIA, and WILMAR OLEO NORTH AMERICA LLC, | : |  |
|  | : |  |
|  | : |  |
| Plaintiffs, | : |  |
|  | : |  |
| and | : |  |
|  | : |  |
| GOVERNMENT OF THE REPUBLIC OF INDONESIA and P.T. MUSIM MAS, | : | Before: Richard K. Eaton, Judge |
|  | : | Consol. Court No. 18-00006 |
| Consolidated Plaintiffs, | : |  |
|  | : |  |
| v. | : |  |
|  | : |  |
| UNITED STATES, | : |  |
|  | : |  |
| Defendant, | : |  |
|  | : |  |
| and | : |  |
|  | : |  |
| NATIONAL BIODIESEL BOARD FAIR TRADE COALITION, | : |  |
|  | : |  |
| Defendant-Intervenor. | : |  |

---

**OPINION and ORDER**

[U.S. Department of Commerce's final determination is remanded.]

Dated: August 11, 2020

*Devin S. Sikes*, Akin Gump Strauss Hauer & Feld LLP, of Washington, DC, argued for Plaintiffs. With him on the brief was *Bernd G. Janzen*.

*Lynn G. Kamarck*, Hughes Hubbard & Reed LLP, of Washington, DC, argued for Consolidated Plaintiff Government of the Republic of Indonesia. With her on the brief were *Matthew R. Nicely* and *Julia K. Eppard*.

*Kelly A. Slater*, Appleton Luff Pte Ltd, of Washington, DC, argued for Consolidated Plaintiff P.T. Musim Mas. With her on the brief were *Edmund W. Sim*, and *Jay Y. Nee*.

*Joshua E. Kurland*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant. With him on the brief were *Joseph H. Hunt*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *L. Misha Preheim*, Assistant Director. Of counsel on the brief was *Catherine D. Miller*, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

*Myles S. Getlan*, Cassidy Levy Kent (USA) LLP, of Washington, DC, argued for Defendant-Intervenor. With him on the brief were *Jack A. Levy* and *Thomas M. Beline*.

Eaton, Judge: This dispute arises from the imposition of countervailing duties on certain shipments of biodiesel fuel[1] from the Republic of Indonesia following the United States Department of Commerce's ("Commerce" or the "Department") determination that the Government of the Republic of Indonesia (the "Government of Indonesia") had provided subsidies to the plaintiff biodiesel producer-exporters. According to Commerce, these subsidies took the form of (1) monetary grants from Indonesia's Biodiesel Subsidy Fund, and (2) goods supplied for less than adequate remuneration resulting from the imposition of two export taxes on biodiesel's main input—crude palm oil. The period of investigation was January 1, 2016, through December 31, 2016. *See Biodiesel From the Rep. of Indonesia*, 82 Fed. Reg. 53,471 (Dep't Commerce Nov. 16, 2017) ("Final Determination") and accompanying Issues and Dec. Mem. (Nov. 6, 2017), P.R. 240 ("Final IDM").

Plaintiffs Wilmar Trading Pte Ltd., PT Wilmar Bioenergi Indonesia, and Wilmar Oleo North America LLC (collectively, "Wilmar"); and Consolidated Plaintiffs the Government of Indonesia and P.T. Musim Mas ("Musim Mas") challenge Commerce's final countervailing duty

---

[1]    Generally, the subject biodiesel fuel is made primarily from crude palm oil and is used for the same purposes as petrodiesel made from crude oil. *See, e.g.*, *Biodiesel From Argentina and Indonesia*, 82 Fed. Reg. 18,423, app. I (Dep't Commerce Apr. 19, 2017) (notice of initiation of countervailing duty investigations). For example, both products can be used as fuel for diesel engines.

determination. Defendant the United States on behalf of Commerce ("Defendant"), and Defendant-Intervenor the National Biodiesel Board Fair Trade Coalition ("Petitioner" or "Defendant-Intervenor"), ask the court to uphold Commerce's Final Determination.

Jurisdiction is found under 19 U.S.C. § 1516a(a)(2)(B)(i) (2012) and 28 U.S.C. § 1581(c) (2012).

For the reasons set forth below, the court holds that two of Commerce's three countervailability findings are supported by substantial evidence and otherwise in accordance with law. First, Commerce did not err in finding that the Government of Indonesia provided countervailable financial contributions in the form of monetary grants to Wilmar and Musim Mas through the Biodiesel Subsidy Fund. Second, Commerce did not err in finding that the Government of Indonesia's 2015 export levy[2] on crude palm oil (the "2015 Export Levy") provided countervailable financial contributions in the form of the provision of goods for less than adequate remuneration.

The court further finds, however, that Commerce's determination that Indonesia's 1994 differential export tariff[3] (the "1994 Export Tariff") on crude palm oil resulted in a financial contribution in the form of goods provided for less than adequate remuneration, is neither supported by substantial evidence nor in accordance with law.

---

[2]   For purposes of this case, a levy is a flat tax applied to all export sales of crude palm oil. *See* Government of Indonesia Initial Questionnaire Resp. (June 29, 2017), P.R. 120 ("GOI Initial Quest. Resp.") at 67; GOI Initial Quest. Resp., Ex. Pt. 12 (June 29, 2017), P.R. 132, at Ex. GOI-CPO-5 (Minister of Finance Regulation No. 133/PMK.05/2015).

[3]   For purposes of this case, a tariff is a changeable rate tax applied to certain export sales of crude palm oil. *See* GOI Initial Quest. Resp., Ex. Pt. 13 (June 29, 2017), P.R. 133, at Ex. GOI-CPO-15.

## BACKGROUND

Over more than two decades, the Government of Indonesia has taken both direct and indirect measures to advance domestic biofuel production. At issue in this case are (1) direct payments from the Government of Indonesia to Plaintiffs, and (2) two separate export taxes that, for Commerce, restrained the export of crude palm oil, thus increasing the domestic supply of this input and driving down its price so that it was more cheaply available to Plaintiffs.

Biodiesel costs more than petrodiesel in an open market. In order to market biodiesel at a price competitive with petrodiesel, Indonesia set up a program to pay biodiesel producers an amount roughly equal to the difference in price between the cheap petrodiesel and the expensive biodiesel. Thus, Indonesia subsidized biodiesel so that it could be sold at a price competitive with the price of petrodiesel. Plaintiffs took advantage of this program.

In addition, Indonesia, over the years, enacted export taxes that, according to Commerce, had the effect of keeping crude palm oil in the country, thus increasing its supply and lowering its domestic price. Commerce determined that the export taxes lowered the domestic price of crude palm oil and consequently provided Plaintiffs with crude palm oil "for less than adequate remuneration." *See* 19 U.S.C. § 1677(5)(D), (E)(iv).

## I.       Direct Payments Through the Biodiesel Subsidy Fund

In 2015, the Government of Indonesia implemented a regulatory scheme intended to support its biodiesel industry. One regulation created the "Biodiesel Subsidy Fund." *See* Government of Indonesia Initial Questionnaire Resp. (June 29, 2017), P.R. 120 ("GOI Initial Quest. Resp.") at 13; GOI Initial Quest. Resp., Ex. Pt. 8 (June 29, 2017), P.R. 128, at Ex. GOI-BSF-1) (Presidential Regulation No. 61/2015). The Biodiesel Subsidy Fund (or the "Fund")

directly paid biodiesel producers amounts in addition to the sales price they received from their customers. *See* GOI Initial Quest. Resp. at 15. The monies for these Fund payments were wholly provided for by the proceeds of the Government of Indonesia's 2015 Export Levy on crude palm oil. *See* Government of Indonesia Suppl. Questionnaire Resp. (Aug. 7, 2017), P.R. 184 ("GOI Suppl. Quest. Resp.") at 1.

## II.   Export Restraints on Crude Palm Oil

### A.   2015 Export Levy

At the same time the Biodiesel Subsidy Fund was created, the Government of Indonesia enacted the 2015 Export Levy, at $50 per metric ton on all exports of crude palm oil. *See* GOI Initial Quest. Resp. at 67; GOI Initial Quest. Resp., Ex. Pt. 12 (June 29, 2017), P.R. 132, at Ex. GOI-CPO-5 (Minister of Finance Regulation No. 133/PMK.05/2015). This levy is collected from producers on their export sales of crude palm oil. The levies paid are then deposited into the Fund. Crude palm oil is a major input for biodiesel. *See* Preliminary Decision Mem. (Aug. 21, 2017), P.R. 199 ("Prelim. Dec. Mem.") at 10 ("[Crude palm oil] is the key feedstock from which biodiesel is manufactured in the Indonesian biodiesel industry."); GOI Initial Quest. Resp. at 65-66 ("[Crude palm oil] can be used for . . . non-food industries (fatty acids, fatty alcohol, glycerin, biofuels)."). The Government of Indonesia represented that "[p]roceeds from this export levy are specifically earmarked for the Biodiesel Subsidy Fund . . . [and are] the Fund's exclusive source of funding." GOI Initial Quest. Resp. at 67.

### B.   1994 Differential Export Tariff

Prior to the 2015 Export Levy, the Government of Indonesia had implemented another tax on crude palm oil: the 1994 Differential Export Tariff. *See, e.g.*, GOI Initial Quest. Resp., Ex. Pt.

11 (June 29, 2017), P.R. 131, at Ex. GOI-CPO-3 (Minister of Finance Regulation No.

136/PMK.010/2015); GOI Initial Quest. Resp., Ex. Pt. 14 (June 29, 2017), P.R. 134, at Ex. GOI-

CPO-23 (Minister of Finance Regulation No. 140/PMK.010/2016 app. I). Under the 1994 Export

Tariff's schedules, a tariff is imposed on exports of crude palm oil when the export price of crude

palm oil exceeds $750 per metric ton. See GOI Initial Quest. Resp., Ex. Pt. 13 (June 29, 2017),

P.R. 133, at Ex. GOI-CPO-15. No tariff is collected unless the threshold of $750 per metric ton is

reached. *See* GOI Initial Quest. Resp. at 66; GOI Initial Quest. Resp., Ex. Pt. 13, at Ex. GOI-CPO-

15. The export price of crude palm oil changes from year to year, or even month to month.


### III.    Commerce's Investigation

On March 23, 2017, Petitioner and Defendant-Intervenor National Biodiesel Board Fair

Trade Coalition, a U.S. trade association comprised of domestic producers of biodiesel,[4] filed a

countervailing duty petition with the Department and the United States International Trade

Commission ("ITC"), covering imports of biodiesel from Indonesia. *See* Prelim. Dec. Mem. at 1;

*Biodiesel From Argentina and Indonesia*, 82 Fed. Reg. 22,155 (Int'l Trade Comm'n May 12, 2017)

("ITC Prelim. Determination"); *Biodiesel from Argentina and Indonesia*, Inv. Nos. 701-TA-571-

572, 731-TA-1347-1348, USITC Pub. 4690 (May 2017) (Preliminary). According to Petitioner,

some of the cheap, subsidized biodiesel entered the U.S. market, and injured the domestic U.S.

renewable fuel industry. *See* ITC Prelim. Determination, 82 Fed. Reg. at 22,155 ("[Before the ITC,

Petitioner alleged] that an industry in the United States [was] materially injured or threatened with

---

[4]       The majority of American biodiesel is ethanol (corn-based). *See, e.g.*, *U.S.
Bionergy Statistics*, U.S. Dep't Agric. (last updated Jul. 21, 2020),
https://www.ers.usda.gov/data-products/us-bioenergy-statistics/ ("Ethanol, made mostly from
corn starch from kernels, is by far the most significant biofuel in the United States.").

material injury by reason of [less than fair value] and subsidized imports of biodiesel from . . .

Indonesia.").

On March 29, 2017, the ITC commenced its material injury investigation. *See Biodiesel From Argentina and Indonesia*, 82 Fed. Reg. 15,541 (Int'l Trade Comm'n Mar. 29, 2017).[5]

On April 19, 2017, Commerce published the notice of initiation of its countervailing duty investigation. *See Biodiesel From Argentina and Indonesia: Initiation of Countervailing Duty Investigations*, 82 Fed. Reg. 18,423 (Dep't Commerce Apr. 19, 2017).

Wilmar and Musim Mas were selected as mandatory respondents[6] because they were the "two largest publicly identifiable producers/exporters, by volume, of subject merchandise [*i.e.*, biodiesel] exported to the United States from Indonesia during the [period of investigation]." Prelim. Dec. Mem. at 2; *see also* 19 U.S.C. § 1677f-1(e)(2)(A)(ii).

---

[5]      On May 8, 2017, the ITC made its preliminary affirmative material injury determination. *See* ITC Prelim. Determination, 82 Fed. Reg. at 22,155; *see also Biodiesel from Argentina and Indonesia*, Inv. No. 701-TA-571-572, 731-TA-1347-1348, USITC Pub. 4690 (May 2017) (Preliminary) at 31 (footnotes omitted) ("Because the domestic industry, despite having the ability to increase its production and shipments, was unable to increase its shipments commensurately with growing demand, it lost revenues that it otherwise would have obtained. These lost revenues were reflected in its poor and declining gross and operating income. We accordingly find that the significant volume of cumulated subject imports, which gained market share at the expense of the domestic industry through significant underselling, had a significant impact on the domestic industry.").

The ITC issued its final affirmative determination of material injury after Commerce's Final Determination in this case. *See Biodiesel From Argentina And Indonesia*, Inv. No. 701-TA-571-572, USITC Pub. 4748 (Dec. 2017) (Final).

[6]      In general, Commerce determines "an individual countervailable subsidy rate for each known exporter or producer of the subject merchandise." 19 U.S.C. § 1677f-1(e)(1). Where, however, the "large number of exporters or producers involved in the investigation" makes it impracticable for Commerce to calculate an individual rate for each one, Commerce may limit individual examination to mandatory respondents, *e.g.*, "exporters and producers accounting for the largest volume of the subject merchandise from the exporting country." *Id.* § 1677f-1(e)(2)(A)(ii).

On November 6, 2017, Commerce issued its Final Determination. There, Commerce found that the Biodiesel Subsidy Fund payments provided Plaintiffs with countervailable subsidies because they were financial contributions, by a government, that benefitted Wilmar and Musim Mas in the amount of each Fund payment. *See* Final IDM at 7 (citation omitted). The Department also found the payments to be specific to the biodiesel industry.[7] *See* Prelim. Dec. Mem. at 10. Although the payments were only available in connection with domestic sales, the Department also found that the subsidies stemming from the Fund payments were attributable to all of Wilmar's and Musim Mas' biodiesel sales, including their exports. *See* Final IDM at 11.

Commerce further found that both the 2015 Export Levy and the 1994 Export Tariff resulted in the provision of countervailable subsidies in the form of goods provided for less than adequate remuneration, because they caused Indonesian crude palm oil (the primary biodiesel input) to remain within the country, available at below-international market prices to Wilmar and Musim Mas. *See* Final IDM at 16.

The Department calculated individual subsidy rates for Wilmar and Musim Mas of 34.45 percent and 64.73 percent, respectively. The All-Others rate was 38.95 percent.[8] *See* Final Determination, 82 Fed. Reg. at 53,472. Of the individual rates, for Musim Mas, 51.97 percent ad valorem was attributed to the Biodiesel Subsidy Fund; 12.74 percent ad valorem was attributed to the "Provision of Palm Oil Feedstock for Less Than Adequate Remuneration," which included both the 2015 Export Levy and the 1994 Export Tariff; and 0.02 percent ad valorem was attributed

---

[7]     Plaintiffs do not challenge Commerce's subsidy determination with respect to the Fund payments on the issue of specificity.

[8]     When only mandatory respondents are examined, Commerce uses their rates to determine an "all-others rate for all exporters and producers not individually investigated and for new exporters and producers." *See* 19 U.S.C. § 1671d(c)(1)(B)(i)(I).

to another, uncontested subsidy. *See* Final IDM at 4-5. For Wilmar, the percentages were, respectively: 24.92; 9.47; and 0.06. *See* Final IDM at 4-5.


## STANDARD OF REVIEW

The court will sustain a determination by Commerce unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).


## LEGAL FRAMEWORK

"The Tariff Act provides that before Commerce imposes a countervailing duty on merchandise imported into the United States, it must determine that a government is providing, directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or export of that merchandise." *Delverde, SrL v. United States*, 202 F.3d 1360, 1365 (Fed. Cir. 2000) (citing 19 U.S.C. § 1671(a)(1) (1994)).

A countervailable subsidy exists where "an authority [a government or governmental actor] . . . provides a financial contribution . . . to a person and a benefit is thereby conferred." 19 U.S.C. § 1677(5)(B). A financial contribution may consist of a "direct transfer of funds," such as a grant. *Id.* § 1677(5)(D)(i). It may also consist of goods and services, when they "are provided for less than adequate remuneration." *Id.* § 1677(5)(D), (E)(iv). Although normally the government provides such a contribution directly, a contribution may exist where a government authority "entrusts or directs a private entity to make [it]," so long as "providing the contribution would normally be vested in the government and the practice does not differ in substance from practices normally followed by governments." *Id.* § 1677(5)(B)(iii).

Commerce measures the benefit according to the type of financial contribution provided. *See id.* § 1677(5)(E). When the subsidy takes the form of a grant, the benefit is measured "in the amount of the grant." *See* 19 C.F.R. § 351.504(a) (2019). When goods are provided for less than adequate remuneration, Commerce measures the benefit using the three-tiered hierarchy of "benchmark" prices against which to test the actual remuneration provided in exchange for the goods. *See* 19 C.F.R. § 351.511(a)(2)(i)-(iii) (setting the benchmark preference for (i) "a market-determined price for the good or service resulting from actual transactions in the country in question," then, if (i) is not available, (ii) "a world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question," and finally (iii) "measur[ing] the adequacy of remuneration by assessing whether the government price is consistent with market principles.").

Further, a countervailable subsidy—either direct or indirect—must meet the requirement of specificity under the subpart of § 1677(5A) that corresponds with the subsidy's type. *See* 19 U.S.C. § 1677(5)(A), (5A). Domestic subsidies are *de jure* specific "[w]here the authority providing the subsidy, or the legislation pursuant to which the authority operates, expressly limits access to the subsidy to an *enterprise or industry*." *Id.* § 1677(5A)(D)(i) (emphasis added). Certain domestic subsidies may be *de facto* specific if "[t]he actual recipients of the subsidy, *whether considered on an enterprise or industry basis, are limited in number*." *Id.* § 1677(5A)(D)(iii)(I) (emphasis added).

Once Commerce determines that a countervailable subsidy exists, it imposes a countervailing duty on the subject merchandise, "equal to the amount of the net countervailable subsidy." *Id.* § 1671(a). Pursuant to its regulations, Commerce calculates "an ad valorem subsidy rate by dividing the amount of the benefit allocated to the period of investigation or review by the

sales value during the same period of the product or products to which the [Department] attributes the subsidy." 19 C.F.R. § 351.525(a). The resulting rate (or percentage) is added with any other ad valorem rate to constitute a respondent's total individual subsidy rate. *See* 19 U.S.C. § 1671(a).

Finally, by finding attribution, Commerce determines which sales were affected by the otherwise countervailable subsidies, and thus which sales will serve as the basis for the ad valorem subsidy rate. Attribution means that, if the Department finds that a subsidy is "tied to a particular market," it will "*attribute* the subsidy only to products sold by the [respondent] to that market." 19 C.F.R. § 351.525(b)(4) (emphasis added). On the other hand, if a subsidy is "tied to a particular product," it will be attributable to all sales of that product. *See id.* § 351.525(b)(5)(i) ("If a subsidy is tied to the production or sale of a particular product, [Commerce] will attribute the subsidy only to that product.").

## DISCUSSION

I.   **Commerce Reasonably Determined that the Biodiesel Subsidy Fund Payments to Wilmar and Musim Mas Were Countervailable**

By creating the Biodiesel Subsidy Fund, Indonesia hoped to encourage the development of its biodiesel industry by establishing a program through which designated buyers (both state-owned and privately owned) would purchase Plaintiffs' biodiesel at the lower, petrodiesel price. Eligibility for payments from the Fund resulted from the sale of biodiesel to designated domestic purchasers such as Pertamina (Indonesia's state-owned oil and gas company) and Corporindo (a private Indonesian fuel blender). *See* GOI Initial Quest. Resp. at 13; Prelim. Dec. Mem. at 9. Plaintiffs would first make a sale of biodiesel to Pertamina or Corporindo at the lower, petrodiesel price. Then, Plaintiffs would apply for and receive a payment from the Fund, equal to the difference between the international petrodiesel price and the higher, domestic biodiesel price

(both as adjusted by the Government of Indonesia).[9] Plaintiffs would thus receive, in total, an amount roughly equal to the domestic "market price" for biodiesel. *See* GOI Initial Quest. Resp. at 13-15.

The stated purpose of the Fund is "to cover [that] difference" between the price of biodiesel and petrodiesel in support of "provision and utilization of biodiesel." *See* GOI Initial Quest. Resp. at 15. Thus, Indonesia hoped to foster increased biodiesel production by allowing Wilmar and Musim Mas to receive a competitive price for their biodiesel, even though their purchasers paid the reduced petrodiesel price.

Whatever the Government of Indonesia's claimed purpose, Commerce found the payments from the Fund to be countervailable subsidies. Plaintiffs object to Commerce's analysis of the Biodiesel Subsidy Fund in three respects: first, they maintain that Commerce erred by finding that the Fund payments were financial contributions in the form of grants to Wilmar and Musim Mas; second, they argue that, even if Commerce's grant determination is correct, the Department erred in its benefit determination, both in measuring the benefit, and by refusing to allow an offset to

---

[9]     In its initial questionnaire response, the Government of Indonesia explained how "market" prices for biodiesel and petrodiesel were calculated:

> [Pursuant to regulation,] the Directorate General for Oil and Gas determines the market price index for [petro]diesel oil, usually every three months. The Directorate General of New Renewable Energy and Energy Conversion . . . determines the market price index for biodiesel on a monthly basis. The reference price for [petro]diesel is determined by referring to the price reported in the Means of Platts Singapore (MOPS) and the production cost of [petro]diesel in Indonesia[,] while the reference price for biodiesel is determined based on the price for [crude palm oil] plus the operation cost of biodiesel. MOPS is the average of Singapore-based oil prices published by Platts, which is a global energy, petrochemicals, metals, and agriculture information provider. Operation costs consist of methanol, power, and labor, for example.

GOI Initial Quest. Resp. at 13-14. In other words, the Government of Indonesia's energy agencies calculate a "market price index" on a monthly or tri-monthly basis to determine the "market price" for petrodiesel and biodiesel.

any payment from the Fund equal to the amount they paid in. Finally, Plaintiffs contest Commerce's decision to attribute the Fund payments to *all* of Wilmar's and Musim Mas' biodiesel sales during the period of investigation.

The first two issues concern distinct elements of Commerce's countervailability analysis: the existence of financial contributions from the Biodiesel Subsidy Fund to Plaintiffs, and the amount of potential benefit conferred by payments from the Fund upon Wilmar and Musim Mas. The attribution issue concerns Commerce's calculation of countervailing subsidy rates for Wilmar and Musim Mas.

### A.    Commerce Correctly Classified the Biodiesel Subsidy Fund Payments as Financial Contributions in the Form of "Grants"

The statute provides that a financial contribution includes the making of grants. *See* 19 U.S.C. § 1677(5)(D)(i) ("The term 'financial contribution' means . . . the direct transfer of funds, such as grants . . . ."). This Court has interpreted "grant" in accordance with the ordinary meaning of the word: that is, a grant is a "gift-like transfer." *See Gov't of Sri Lanka v. United States*, 42 CIT __, __, 308 F. Supp. 3d 1373, 1383 (2018). The payments to biodiesel producers Wilmar and Musim Mas were made by the Government of Indonesia, through a program that required the producers to submit applications for approval and payment following the sales of their biodiesel at the petrodiesel price. *See* Final IDM at 7. As noted, these Fund payments were designed to bring the total amount received by Plaintiffs up to the domestic market price for biodiesel. The payment application would inform the Government of Indonesia of the sales price for their biodiesel. *See* GOI Initial Quest. Resp. at 24. The Government, through the Fund, would then pay to Wilmar and Musim Mas roughly the difference between the payment they had received and the domestic market price for biodiesel. The Government of Indonesia received nothing in exchange for the

payments from the Fund. *See* Final IDM at 7. Based on these facts, Commerce determined that the

payments from the Fund were grants.

During the investigation and before the court, Plaintiffs have argued that the Biodiesel

Subsidy Fund payments were not grants, but were instead part of the sales price for their biodiesel,

because the amount they received was the difference between the market price for biodiesel and

that for petrodiesel. *See* Pls.' & Consol. Pls.' Mot. J. Agency R., ECF No. 38 ("Pls.' Br.") 17-18

("The record unequivocally shows that [Fund] payments constitute part of the full payment for

purchases of biodiesel. . . . [T]he [Government of Indonesia] makes the payments in return for

biodiesel sold [to Pertamina and Corporindo]. . . . Commerce *explicitly* found that Wilmar and

Musim Mas treat the payments as 'revenue' for their respective sales of biodiesel [to those two

companies] . . . , a finding that squarely contradicts Commerce's assertion that the [Government

of Indonesia] received nothing in return for the payments.").

This argument cannot be credited. While the amount of the grant may have been calculated

to bring the amount received up to the constructed market value of Plaintiffs' product, the

Government of Indonesia bought nothing and received nothing for the Fund's money other than

the possibility of achieving the governmental goal of fostering a domestic biodiesel industry in

Indonesia.[10] Wilmar's and Musim Mas' classification of Fund payments as revenue is not

---

[10]     Plaintiffs argued before the agency that, because one of the energy companies
(Pertamina) that purchased biodiesel is state-owned, the Government of Indonesia effactually
purchased biodiesel from Wilmar and Musim Mas. *See* Final IDM at 9. While it is true that
Pertamina is state-owned, Corporindo is not. Thus, the Department found that "[t]he [Fund]
payments are made regardless of the [Government of Indonesia's] receipt of the goods in question,
and could – in theory – be made without any participation of Pertamina." Final IDM at 9. In other
words, although Pertamina was a state-owned company, it was not the sole purchaser of the
biodiesel for which Wilmar and Musim Mas received Fund payments. *See* Final IDM at 9 ("[The
argument] that, because Pertamina is a state-owned company, it 'might be . . . purchasing biodiesel
on the [Government of Indonesia's] behalf' . . . cannot be made with regard to Corporindo[, the
private company that also receive[d] Fund payments]."). Therefore, even if the court were to find

dispositive, because, to obtain funding from the Biodiesel Subsidy Fund, they did not contract with the Government of Indonesia to sell biodiesel or anything else. Therefore, Commerce was reasonable in its finding that these Fund transfers, clearly distinct from the price paid by the actual purchasers, were financial contributions in the form of grants.

In other words, the Fund's payment system provided contributions to Wilmar and Musim Mas. The Fund was created to provide a subsidy to biodiesel producers as a way of supporting the biodiesel industry. The Government of Indonesia made payments from the Fund, but received nothing in return. Therefore, Commerce's finding that the Fund payments were countervailable financial contributions to Wilmar and Musim Mas is supported by substantial evidence.

### B.     Commerce Reasonably Measured the Benefit of the Grants

#### 1.     Commerce Relied on the Appropriate Regulatory Standard for Measuring Benefit

After finding that the Government of Indonesia had made financial contributions in the form of grants to Wilmar and Musim Mas, Commerce measured the amount of benefit Wilmar and Musim Mas received from those grants. *See* 19 U.S.C. § 1677(5)(E) (outlining the rules for measuring benefit). Commerce's regulations provide that, where the countervailable subsidy takes the form of a grant, "a benefit exists in the amount of the grant." 19 C.F.R. § 351.504(a).

Plaintiffs urge the court to find that Commerce should have measured the benefit, if any, under "either the adequacy of remuneration standard in 19 C.F.R. § 351.511,[11] or the 'receives

---

that Pertamina's purchases counted as purchases by the Government of Indonesia, the Biodiesel Subsidy Fund payments would still constitute grants because Pertamina's involvement was not required.

[11]     When a subsidy takes the form of the provision of goods, the benefit is generally found to exist "to the extent that such goods or services are provided for less than adequate remuneration." 19 C.F.R. § 351.511(a)(1).

more revenues than it otherwise would earn' standard in 19 C.F.R. § 351.503.[12]" Pls.' Br. 22, 24.

Once again, Plaintiffs try to make their case by claiming that the payments were part of the price

paid to Wilmar and Musim Mas in exchange for their biodiesel, and, therefore, a benefit analysis

should analyze the payments from the Fund as part of the total biodiesel price.[13] The gist of

Plaintiffs' argument is that Commerce should have treated the Fund payments as part of the

payment for biodiesel sales, and then determined whether the total amount received from the

purchasers, and the Fund, was more or less than an "adequate" price to pay for biodiesel.

Despite Plaintiffs' arguments, since the court has sustained Commerce's finding that the

financial contributions here were in the form of grants, the standard for measuring the benefit from

those financial contributions is the standard in § 351.504(a). *See* 19 C.F.R. § 351.504(a) ("In the

case of a grant, a benefit exists in the amount of the grant."). Commerce, therefore, reasonably

determined that the grants benefitted Wilmar and Musim Mas in an amount equal to the amount

of the grants, which is to say, in the amount of the Fund transfers.

---

[12]     For otherwise uncategorized subsidies, Commerce "normally will consider a benefit to be conferred where a firm pays less for its inputs (e.g., money, a good, or a service) than it otherwise would pay in the absence of the government program, or receives more revenues than it otherwise would earn." 19 C.F.R. § 351.503(b)(1).

[13]     As support for their position, Plaintiffs cite *Government of Sri Lanka*. Pls.' Br. 19 (citing *Gov't of Sri Lanka*, 42 CIT at __, 308 F. Supp. 3d at 1383) ("The Court's recent decision in *Government of Sri Lanka* confirms that the [Fund] payments do not meet the [gift-like transfer] definition of a 'grant,' whether in the financial contribution statute or in Commerce's regulations."). The *Government of Sri Lanka* Court, however, found that the alleged financial contributions in that case were "interest-free repayment" of debts owed by the Sri Lankan government to the respondents, that were "unlike a grant, loan, or equity infusion." *See Gov't of Sri Lanka*, 42 CIT at __, 308 F. Supp. 3d at 1381. Here, the payments from the Government of Indonesia were not loans or repayments of loans, because the amounts paid into the Fund and the amounts paid out to Wilmar and Musim Mas bore no relation to each other.

### 2. Plaintiffs Were Not Entitled to an Offset Based on Their Levy Payments

Both Wilmar and Musim Mas exported crude palm oil, and consequently paid levies under the 2015 Export Levy. These levies were then deposited into the Fund. *See* Final IDM at 13. Based on these payments, Plaintiffs insist that they are entitled to an offset to the amount of the benefit they received equal to their contributions to the Fund. In their view, Commerce should have deducted their Fund contributions when measuring the benefit received by Wilmar and Musim Mas. Thus, Plaintiffs would have the benefit reduced by an amount equal to the total amount each contributed to the Fund under the 2015 Export Levy. *See* Pls.' Br. 25.

The Department declined to make this offset because it found that Plaintiffs' payments into the Fund, collected under the 2015 Export Levy, were unrelated to the amount of the grants subsequently paid from the Fund. *See* Final IDM at 13 ("[A] company does not need to make any payments into the [Fund] in order to be eligible for [Fund] payments, and a company that makes payments into the [Fund] through [crude palm oil] export levies is not automatically, by virtue of such payments, eligible for [Fund] payments.").

While both Wilmar and Musim Mas paid into the Fund, there is no necessary relationship between the source or the amount of the levies collected and eligibility to receive payments from the Fund or the amount of the payments. That is, a company need not pay into the Fund in order to draw payments from it. In order to be eligible for payments from the Biodiesel Subsidy Fund, Plaintiffs need only make domestic sales of biodiesel and complete the application process dictated by Indonesian regulation. *See* Final IDM at 13; *see also* GOI Initial Quest. Resp. at 15 (outlining application process). So, had Wilmar and Musim Mas made no payments into the Fund, they still would have been entitled to receive grants from it because they sold their biodiesel at the petrodiesel price to companies designated by the Government of Indonesia.

Moreover, despite Plaintiffs' claim to an offset, it is worth noting that there is no indication in the record that the Government of Indonesia "specifically intended" to offset the levy payments made by exporters of crude palm oil, by means of the Biodiesel Subsidy Fund or in any other manner. *See* 19 U.S.C. § 1677(6)(C) (emphasis added) ("For the purpose of determining the net countervailable subsidy, [Commerce] may subtract from the gross countervailable subsidy the amount of . . . export taxes, duties, or other charges levied on the export of merchandise to the United States *specifically intended to offset the countervailable subsidy received*."). Therefore, because there is no legal or factual connection between the amounts Plaintiffs paid into the Fund and the amounts they received, Commerce reasonably declined to offset Wilmar's and Musim Mas' payments into the Fund against the amounts received from the Fund.

### C.    Commerce Reasonably Attributed the Biodiesel Subsidy Fund Grants to All of Plaintiffs' Sales of Biodiesel

Commerce calculates "an ad valorem [per program] subsidy rate by dividing the amount of the benefit . . . by the sales value . . . of the product or products to which the [Department] attributes the subsidy." 19 C.F.R. § 351.525(a). In other words, before calculating an ad valorem subsidy rate, Commerce must address the issue of attribution by determining which, if any, of respondents' U.S. sales were targeted by the subsidies.

In its Final Determination, Commerce found that the Biodiesel Subsidy Fund provided grants that were tied (*i.e.*, attributed) to all sales of biodiesel by Wilmar and Musim Mas, not just those made in the Indonesian market. *See* Final IDM at 11. Thus, Commerce found that the Fund grants, though paid only in connection with domestic Indonesian sales of biodiesel, also subsidized Wilmar's and Musim Mas' *U.S. sales* of biodiesel. *See* Final IDM at 11 (stating that the Fund "is intended to promote the production of biodiesel" without any limitation on how its payments are used). Thus, although the grants resulted from domestic sales, and the amount of the grant was

determined by using domestic sales, the grant money served to subsidize all of Plaintiffs' biodiesel product. For Commerce, the Government of Indonesia "inten[ded] to ensure the existence of the biodiesel industry as a whole," including the U.S. sales segment. Final IDM at 11.

Plaintiffs' U.S. sales were under investigation in this case, and, since Commerce found them to be subsidized by the Fund grants, these sales formed the basis for an ad valorem subsidy rate for the Biodiesel Subsidy Fund payments. *See* 19 C.F.R. § 351.525(a). Commerce calculated Wilmar's and Musim Mas' ad valorem subsidy rates for the Fund grants by dividing the total amount of the Fund payments the companies received by the sales value of all their sales of biodiesel during the period of investigation. *See id.*; *see also id.* § 351.504(a) ("In the case of a grant, a benefit exists in the amount of the grant.").

Plaintiffs object that Commerce unlawfully attributed the grants "to all biodiesel sales," including exports to the United States, "rather than attribut[ing] those alleged subsidies only to Wilmar's and Musim Mas's sales of biodiesel in Indonesia." Pls.' Br. 10, 13. In Plaintiffs' view, the ad valorem subsidy rate for the Fund payments should be zero, because neither Wilmar nor Musim Mas received any Fund payments for sales of biodiesel in the U.S. market. According to Plaintiffs, the Biodiesel Subsidy Fund payments were only tied to biodiesel transactions that occurred in Indonesia. *See* Pls.' Br. 11 ("Substantial record evidence demonstrates that the [Fund] payments were tied only to one market—domestic biodiesel sales in Indonesia [because] Commerce . . . confirmed that the payments are limited [in availability] to domestic biodiesel sales in Indonesia.").

Commerce's determination is sustained, however, because it reasonably found that the purpose of the Fund was to subsidize biodiesel *as a product*, whether sold domestically or exported, and that there were no restrictions on how the grant money would be used. *See* Final

IDM at 11 (citing 19 C.F.R. § 351.525(b)(5)) ("The [Government of Indonesia's] application for [companies to seek payments] demonstrates only a concern with the commitment, capacity, and quality of the producers of biodiesel. [It does not favor] producers that target the domestic market over the export market but, rather, the [Fund] is intended to promote the production of biodiesel. Therefore, we are continuing to tie [Fund] payments to all biodiesel sales."). This Court has recognized that "Commerce, as a matter of practice, determines whether a subsidy is tied by evaluating the purpose of the subsidy based on information available at the time of bestowal; Commerce does not trace how the subsidy is actually used by recipients." *Jindal Poly Films Ltd. of India v. United States*, 44 CIT __, __, 439 F. Supp. 3d 1354, 1360 (2020) (citations omitted). In accordance with its practice, Commerce thus concluded that the Government of Indonesia was subsidizing the production of biodiesel whether or not it stayed in Indonesia or found its way into the world market. The subsidy stayed with the product.

Commerce is right that the Fund subsidies should be attributed to all of Wilmar's and Musim Mas' sales of biodiesel (*i.e.*, in Indonesia and the United States) during the period of investigation. *See* 19 C.F.R. § 351.525(b)(5)(i) ("If a subsidy is tied to the production or sale of a particular product, [Commerce] will attribute the subsidy only to that product."). Indeed, the Indonesian regulation that created the Fund described the Fund's purpose as "ensur[ing] the sustainable development of oil palm plantation . . . [and] . . . provision and utilization of biodiesel type of biofuel." *See* GOI Initial Quest. Resp., Ex. Pt. 8, at Ex. GOI-BSF-1; *see also* Final IDM at 11 ("[T]he configuration of the [Fund] suggests part of [its] intent is to ensure the existence of the biodiesel industry as a whole, not just the domestic sales segment."). The regulation says nothing about providing cheap domestic biodiesel. The provision of cheap domestic biodiesel, then, is just a means to an end—sustaining Indonesia's biodiesel industry. Thus, Commerce found that even

though the Fund payments were made only upon domestic sales of the biodiesel, the purpose of the payments was to subsidize biodiesel in both the domestic and U.S. markets.

The court agrees that "the [Fund] is intended to promote the production of biodiesel" without regard to whether producers such as Wilmar and Musim Mas sold their biodiesel domestically or internationally, and that it resulted in lowering the price of Indonesian biodiesel in the U.S. market. *See* Final IDM at 11. Therefore, Commerce's decision to attribute the benefit of the Fund payments to all of Wilmar's and Musim Mas' exports of biodiesel is sustained.

## II.   Commerce's Determination That Crude Palm Oil, a Biodiesel Input, Was Being Provided to Wilmar and Musim Mas for Less than Adequate Remuneration Was Reasonable Only with Respect to the 2015 Export Levy

In addition to its finding that the payments from the Biodiesel Subsidy Fund constituted grants, Commerce also found that the Government of Indonesia made countervailable financial contributions to Plaintiffs by providing them with goods for less than adequate remuneration. Specifically, the Department found that the Government of Indonesia had used (1) the 2015 Export Levy and (2) the 1994 Export Tariff to artificially lower crude palm oil's domestic price. The court finds that, while Commerce's determination is reasonable as to the 2015 Export Levy, its finding as to the 1994 Export Tariff is not supported by substantial evidence or in accordance with law.

Under the statute, a financial contribution may take the form of goods or services. *See* 19 U.S.C. § 1677(5)(D). In such cases, the additional requirement of benefit conferred is met "if such goods or services are provided for less than adequate remuneration." *Id.* § 1677(5)(E)(iv). Further, a financial contribution of any kind may exist where a government authority "entrusts or directs a private entity to make a financial contribution," so long as "providing the contribution

would normally be vested in the government and the practice does not differ in substance from practices normally followed by governments." 19 U.S.C. § 1677(5)(B)(iii).

Here, Commerce determined that, through the use of the 2015 Export Levy on crude palm oil and the 1994 Export Tariff, the Government of Indonesia kept crude palm oil in Indonesia, increasing the domestic supply, and thus lowering its price in the Indonesian market.

A.   **The 2015 Export Levy Resulted in Goods Provided to Wilmar and Musim Mas for Less than Adequate Remuneration**

Plaintiffs challenge Commerce's subsidy determination on three grounds. First, Plaintiffs challenge the Department's finding that the Government of Indonesia entrusted and directed private producers of crude palm oil to provide their product to Wilmar and Musim Mas for less than adequate remuneration. Next, Plaintiffs challenge the Department's measurement of the benefit Plaintiffs allegedly received: that is, Plaintiffs disagree with the benchmark that Commerce established for measuring the adequacy of remuneration received for crude palm oil. Finally, Plaintiffs argue that the alleged subsidy was not sufficiently specific.

The court sustains all three of Commerce's findings in support of its subsidy determination with respect to the 2015 Export Levy.

1.   **The Government of Indonesia Entrusted and Directed Private Producers to Provide Wilmar and Musim Mas with Cheap Crude Palm Oil**

Under the statute, a countervailable financial contribution may be made indirectly where a government authority "entrusts or directs a private entity to make a financial contribution," so long as "providing the contribution would normally be vested in the government and the practice does not differ in substance from practices normally followed by governments." 19 U.S.C. § 1677(5)(B)(iii).

The Statement of Administrative Action accompanying the Uruguay Round Agreements

Act ("SAA")[14] provides additional guidance for this type of financial contribution:

> Commerce has found a countervailable subsidy to exist where the government took or imposed (through statutory, regulatory or administrative action) [1] a formal, *enforceable measure* [2] which *directly led to* [3] a discernible benefit being provided to the industry under investigation. In cases where the government acts through a private party . . . the Administration intends that the law continue to be administered on a case-by-case basis . . . .

Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R.

Doc. No. 103–316 at 926 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 4040, 4239 (emphasis

added). The SAA acknowledges that "[t]he specific manner in which the government act[s]

through the private party to [make a financial contribution resulting in a benefit] varie[s] widely."

*Id.* (emphasis added).

### i.      Private Crude Palm Oil Producers Provided Cheap Crude Palm Oil for Less than Adequate Remuneration to Wilmar and Musim Mas

Commerce found that the 2015 Export Levy on the Indonesian crude palm oil market

resulted in indirect financial contributions to Wilmar and Musim Mas in the form of goods

provided for less than adequate remuneration. Specifically, the Department stated that "export

restraints can amount to government entrustment or direction of private entities to provide financial

contributions," and that the 2015 Export Levy "encourage[d] . . . private producers to sell their

products to Indonesian biodiesel producers[, thus keeping] domestic prices of [crude palm oil]

below world prices." Final IDM at 16.

---

[14]      The SAA is authoritative. *See* 19 U.S.C. § 3512(d) ("The statement of administrative action approved by the Congress under section 3511(a) of this title shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application.").

Plaintiffs insist that, for the 2015 Export Levy to constitute a financial contribution qualifying as a subsidy, Commerce was required to find that the 2015 Export Levy *compelled* Indonesian crude palm oil producers to sell their product at low prices to Wilmar and Musim Mas. *See* Pls.' Br. 32 (emphasis added) ("The [levy] fail[s] to meet the [entrustment and direction] test. The [levy does] not *affirmatively obligate* private parties to supply [crude palm oil] to Indonesian biodiesel producers at all, and certainly do not require them to provide [crude palm oil] at any particular price."). Plaintiffs also cite the SAA's statement that "Commerce has found a countervailable subsidy to exist where the government took or imposed (through statutory, regulatory or administrative action) a formal, *enforceable measure* which *directly led to* a discernible benefit being provided to the industry under investigation." *See* SAA at 926, *as reprinted in* 1994 U.S.C.C.A.N. at 4239.

Finally, Plaintiffs argue that Commerce could not reasonably have made a subsidy determination with respect to the 2015 Export Levy because "[p]rivate parties were free to export [crude palm oil] from Indonesia and, in fact, more than half of the [crude palm oil] that they produced during the [period of investigation was exported from] Indonesia [to] foreign markets." Pls.' Br. 34 (citing GOI Initial Quest. Resp. at 62-63). For Plaintiffs, these foreign sales indicate that the 2015 Export Levy did not deter crude palm oil exports, and that the 2015 Export Levy did not keep crude palm oil in Indonesia, thus increasing the supply and lowering its domestic price.

On behalf of Commerce, Defendant argues that Plaintiffs assert an overly stringent standard by requiring Commerce to find evidence that the Government of Indonesia "affirmatively obligate[d]" crude palm oil producers to sell their product at reduced prices. Pls.' Br. 32; *see* Def.'s Resp. Pls.' & Consol. Pls.' Mot. J. Agency R., ECF No. 52 ("Def.'s Br.") 38

("[T]he SAA makes clear that the 'entrusts or directs' standard should be interpreted broadly, so that 'indirect provision' of a subsidy does not become a 'loophole' for unfairly traded imports to injure a United States industry."). Likewise, in its Final Determination, Commerce rejected Plaintiffs' notion that, in order to satisfy the statute and the SAA, the 2015 Export Levy must compel the sale of crude palm oil in the domestic market at below-market rates. Rather, the Department believes that it only needed to confirm that, following the imposition of the 2015 Export Levy, prices of crude palm oil fell and Wilmar and Musim Mas were able to buy cheap crude palm oil. Based on more than two years of data comparing Indonesian prices for crude palm oil to world prices, Commerce determined that the 2015 Export Levy "represented a [Government of Indonesia] policy supporting the respondents in the ultimate and indirect form of cheaper [crude palm oil] prices." Final IDM at 17 (emphasis added) ("From October 2014 through June 2015, after deducting freight expenses, the price of [crude palm oil] was always higher in Indonesia than it was on the world market. *In July 2015, when the $50/MT export levy was implemented, prices of [crude palm oil] in Indonesia dropped well below world market prices for 15 out of the next 18 months.*").

As additional evidence, the Department noted that Indonesia has conceded that its purpose for imposing the 2015 Export Levy was to increase the domestic supply and lower domestic prices. In an explanation to the World Trade Organization, the Government of Indonesia stated:

> The Government is making further use of export taxes [including a levy on crude palm oil]. . . . According to the authorities, export taxes on primary commodities *can be used to reduce the domestic price of primary products in order to guarantee supply of intermediate inputs at below world market prices for domestic processing industries*. In this way, *export taxes provide an incentive for the development of domestic manufacturing* or processing industries with higher value-added exports.

Petition Exs., Vol. V.15 (Mar. 23, 2017), P.R. 20, at Ex. CVD-IND-28 (WTO Trade Policy Review of Indonesia) (emphasis added).

Further, Commerce's subsidy determination as to the 2015 Export Levy relied on language in the Indonesian regulation which created the Fund and made the levy its source of funding. *See* Final IDM at 18; *see also* GOI Initial Quest. Resp., Ex. Pt. 8, at Ex. GOI-BSF-1 ("[The Fund's purpose is] to ensure the sustainable development of oil palm plantation . . . [for among other things, the] [p]rovision and utilization of biodiesel type of biofuels."); GOI Suppl. Quest. Resp. at 2 ("The export levies are primarily used to fund the [Biodiesel Subsidy Fund]."). All in all, Commerce was satisfied that the Government of Indonesia's 2015 Export Levy fulfilled the intentions declared to the WTO, and that the 2015 Export Levy "ensure[s] that . . . private [crude palm oil] producers play [the] role [of government] instruments to guarantee supply of [crude palm oil] to biodiesel producers." Final IDM at 17.

With respect to Plaintiffs' argument that the 2015 Export Levy failed to create the necessary market conditions for an indirect subsidy because exports from Indonesia continued, Commerce justified its finding as follows:

> The fact that the [Government of Indonesia] attempts to balance [its objective of providing cheaper crude palm oil to Wilmar and Musim Mas] with competing objectives such as ensuring continued revenue from [crude palm oil] exports does not negate the conclusion . . . that the policy has, in fact, succeeded in causing domestic sales and lowering domestic prices. The [Government of Indonesia] has simply struck a balance between different aspects of its economy and different development objectives by choosing a "softer" restraint over a full-out embargo.

Final IDM at 19. In sum, for Commerce, the Government of Indonesia "use[d] private [crude palm oil] producers as its instruments to guarantee supply of [crude palm oil] to biodiesel producers." Final IDM at 17. The levy "ensure[d] that the private [crude palm oil] producers play [the] role" of providing product to Indonesian biodiesel producers. Final IDM at 17. Put another way, the 2015 Export Levy was enacted, at least in part, to increase the amount of crude palm oil in the domestic market and lower its price by increasing the price of Indonesian crude palm oil

on the world market. Because the levy fulfilled its intended purpose, and crude palm oil prices

fell, domestic consumers, including biodiesel producers such as Wilmar and Musim Mas, were

subsidized.

In addition, Commerce satisfied the statute and the SAA by finding that the Government

of Indonesia *had* implemented a "formal, enforceable measure" in the form of the 2015 Export

Levy, which the Government of Indonesia had put in place as part of a plan to suppress the

domestic price, thereby providing a cheap input for downstream products (*e.g.*, biodiesel). *See*

GOI Initial Quest. Resp., Ex. Pt. 8, at Ex. GOI-BSF-1 (linking the levy to biodiesel); *see also*

Petition Exs., Vol. V.15, at Ex. CVD-IND-28.

Moreover, Commerce showed that the 2015 Export Levy *did* directly lead to the intended

contribution: consistently lower prices for crude palm oil sold in the Indonesian market. *See* Final

IDM at 17; *See* Pet.'s Rebuttal Br. (Oct. 17, 2017), P.R. 237, at 23 tbl. 1 (showing, from a

summary of Plaintiffs' submitted data, that the Indonesian prices for crude palm oil went down

after the implementation of the levy).[15] As noted, during the nine months prior to the

---

[15]     Below is a modified version of "Table 1" from Petitioner's Rebuttal Brief,
illustrating the difference between Indonesian prices for crude palm oil and world prices for crude
palm oil. The italicized dollar amounts represent the amount by which Indonesian prices for crude
palm oil rose above world prices. The non-italicized dollar amounts, preceded by minus signs,
represent the amount by which Indonesian prices fell below world prices.

implementation of the 2015 Export Levy, Indonesian prices were always higher than world prices for crude palm oil.[16] Conversely, for the eighteen months following the implementation of the 2015 Export Levy, including the twelve-month period of investigation, Indonesian prices only exceeded world prices on three occasions. *See* Final IDM at 17; Pet.'s Rebuttal Br. at 23 tbl. 1. The court holds that Commerce reasonably relied on this evidence in making a finding that Indonesian prices for crude palm oil were lowered by the 2015 Export Levy.

As for Plaintiffs' argument relating to evidence of continuing exports of crude palm oil after the implementation of the levy, Commerce rightly recognized that nothing in the statute or the SAA required it to show that a majority of exports had ceased, or even that a complete

| Pre-Imposition of 2015 Export Levy | | Post-Imposition of 2015 Export Levy | |
|---|---|---|---|
| **Month** | Difference b/t Indonesian & World Price for CPO (w/freight deductions) | **Month** | Difference b/t Indonesian & World Price for CPO (w/freight deductions) |
| **Oct. 2014** | *$77.05 per metric ton* | **Jul. 2015** | -$14.50 per metric ton |
| **Nov. 2014** | *$60.58 per metric ton* | **Aug. 2015** | -$91.75 per metric ton |
| **Dec. 2014** | *$13.62 per metric ton* | **Sep. 2015** | -$17.53 per metric ton |
| **Jan. 2015** | *$74.77 per metric ton* | **Oct. 2015** | *$40.98 per metric ton* |
| **Feb. 2015** | *$78.53 per metric ton* | **Nov. 2015** | -$40.14 per metric ton |
| **Mar. 2015** | *$54.04 per metric ton* | **Dec. 2015** | *$10.80 per metric ton* |
| **Apr. 2015** | *$15.09 per metric ton* | **Jan. 2016** | -$55.78 per metric ton |
| **May 2015** | *$39.99 per metric ton* | **Feb. 2016** | -$129.58 per metric ton |
| **Jun. 2015** | *$50.59 per metric ton* | **Mar. 2016** | -$122.13 per metric ton |
| | | **Apr. 2016** | -$80.91 per metric ton |
| | | **May 2016** | -$1.46 per metric ton |
| | | **Jun. 2016** | -$9.51 per metric ton |
| | | **Jul. 2016** | *$3.02 per metric ton* |
| | | **Aug. 2016** | -$127.96 per metric ton |
| | | **Sep. 2016** | -$84.98 per metric ton |
| | | **Oct. 2016** | -$5.84 per metric ton |
| | | **Nov. 2016** | -$93.76 per metric ton |
| | | **Dec. 2016** | -$94.85 per metric ton |

[16]     Indonesian prices were always higher than world prices for crude palm oil when accounting for the deduction of freight. *See* Final IDM at 17.

embargo on crude palm oil had occurred.[17] *See* Final IDM at 18-19 ("Our analysis is not whether there is a complete embargo or whether the [Government of Indonesia] seeks to support the respondents through the complete prohibition of [crude palm oil]. Rather, the analysis is whether the [Government of Indonesia] seeks to support the respondents through a policy and a pattern of practice that lowers [crude palm oil] prices paid domestically by altering the attractiveness of the domestic market vis-à-vis the export market, thereby causing private [crude palm oil] producers to sell more of their product domestically."); *see also, e.g.*, SAA at 926, *as reprinted in* 1994 U.S.C.C.A.N. at 4239 ("Commerce has found a countervailable subsidy to exist where the government took or imposed (through statutory, regulatory or administrative action) a formal, enforceable measure which directly led to a discernible benefit being provided to the industry under investigation."). In other words, substantial evidence of cheaper prices resulting from the 2015 Export Levy supports Commerce's subsidy determination.

Finally, the law speaks of enforceable measures leading to a contribution that provides a benefit. The law does not require that private actors be *compelled* to perform a government function for entrustment and direction to be found. *See* SAA at 926, *as reprinted in* 1994 U.S.C.C.A.N. at 4239 ("The specific manner in which the government act[s] through the private party to [make a financial contribution resulting in a benefit] varie[s] widely.").

---

[17]     Plaintiffs also claim that Commerce was required to look at more than the thirty months of price data that it analyzed, because it has examined longer periods of time in other proceedings concerning "export restraints." *See* Pls.' Br. 36. As the Department points out, however, this argument is not properly before the court because Plaintiffs failed to raise it before the agency. *See* Def.'s Br. 40; *compare* Pls.' & Consol. Pls.' Joint Case Br. (Oct. 12, 2017), P.R. 230-234, at 15-24, *with* Pls.' Br. 35-37; *see also* 28 U.S.C. § 2637(d) ("[T]he Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies.").

Therefore, the Department's financial contribution finding, based on the Government of Indonesia's entrustment and direction of private parties through the 2015 Export Levy, is sustained.

>    **ii.     The Use of the Export Levy to Lower Prices Was a Practice That Would Normally Be Vested in a Government**

The court also finds that Commerce did not err in finding that providing crude palm oil for below-market prices, by means of a governmentally enacted tax system, qualified as a practice normally vested in a government. *See* 19 U.S.C. § 1677(5)(B)(iii) (emphasis added) ("A subsidy [exists when] an authority . . . makes a payment to a funding mechanism to provide a financial contribution, or entrusts or directs a private entity to make a financial contribution, *if providing the contribution would normally be vested in the government and the practice does not differ in substance from practices normally followed by governments*.").

Plaintiffs maintain that "Commerce took the position that [the statute] requires . . . an assessment of 'whether the activity would constitute a financial contribution if performed by the government directly, rather than by the private entity that was entrusted or directed.'" Pls.' Br. 39-40 (quoting Final IDM at 19). In so doing, they claim, Commerce duplicated its financial contribution analysis and "render[ed] portions of the statutory text superfluous." *See* Pls.' Br. 40. Plaintiffs argue that more is required than a finding that a financial contribution exists. To satisfy the "entrusts or directs" standard, they argue, Commerce must have shown that the type of contribution was one that would be "normally vested in the government"—*i.e.*, Commerce had to do more than repeat its determination that a financial contribution existed. *See* Pls.' Br. 39-40.

Commerce, relying on this Court's holding in *Hynix Semiconductor Inc. v. United States*, stated that "the question is whether the activity would constitute a financial contribution if performed by the government directly, rather than by the private entity that was entrusted or

directed." Final IDM at 19 (citing *Hynix Semiconductor Inc. v. United States*, 30 CIT 288, 308, 425 F. Supp. 2d 1287, 1305 (2006)) (approving Commerce's decision to countervail a financial contribution that "could be characterized as fulfilling a 'governmental subsidy function'")).

Plaintiffs' arguments are without merit. As has been established, the Government of Indonesia created the 2015 Export Levy on crude palm oil, with the intention of supporting the biodiesel industry by providing crude palm oil at below-market prices. By imposing the levy, the Government of Indonesia increased the price of Indonesian crude palm oil on the world market and lowered it on the domestic market. The upshot was that the Indonesian Government used the domestic producers of crude palm oil as its instrument to supply buyers with inexpensive crude palm oil. Therefore, the Government of Indonesia entrusted and directed Indonesian crude palm oil producers to provide their product, a primary biodiesel input, to biodiesel producers such as Wilmar and Musim Mas at lower prices.

Also, Commerce reasonably found that a government's use of a tax regulation to drive down prices within the domestic market was uniquely within that government's powers. Delegating the actual provision of goods to private producers of crude palm oil is exactly the sort of action that the entrustment and direction statute is meant to govern. *See* 19 U.S.C. § 1677(5)(B)(iii). And, in fact, that is what happened. The crude palm oil producers provided goods for less than adequate remuneration as a result of a tax program, put in place by the Government of Indonesia, designed to have crude palm oil producers do just that.

Therefore, the court sustains Commerce's entrustment and direction finding with respect to the 2015 Export Levy.

> **2.      Commerce Reasonably Used a World Price Benchmark to Measure the Benefit Resulting from the 2015 Export Levy**

Commerce must make distinct findings as to the elements of financial contribution and benefit. *See* 19 U.S.C. § 1677(5)(B)(i) (financial contribution); *id.* § 1677(5)(E) (benefit). The benefit derived from a countervailable subsidy is measured according to the type of financial contribution made. *See id.* § 1677(5)(E).

When a subsidy takes the form of goods or services provided for less than adequate remuneration, it must have a comparison price by which to measure any benefit. By regulation, Commerce finds this comparison price by establishing a "benchmark" price by means of "a three-tiered, hierarchical approach" that "determin[es] the adequacy of remuneration of an investigated good or service." *Maverick Tube Corp. v. United States*, 41 CIT __, __, 273 F. Supp. 3d 1293, 1299 (2017) (citation omitted); *see* 19 C.F.R. § 351.511(a)(2)(i)-(iii). Commerce's first benchmark preference is for "a market-determined price for the good or service resulting from actual transactions in the country in question." 19 C.F.R. § 351.511(a)(2)(i).

If, however, the "[a]ctual market-determined price [is] unavailable," Commerce will compare

> the government price to a world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question. Where there is more than one commercially available world market price, the [Department] will average such prices to the extent practicable, making due allowance for factors affecting comparability.

*Id.* § 351.511(a)(2)(ii).

Thus, the regulation provides for the establishment of a benchmark. Here, Commerce determined that crude palm oil prices from Indonesia were too distorted by the effects of the 2015 Export Levy to be used as a benchmark for measuring "adequate remuneration." *See* Final IDM at 20-21 ("[T]he record empirically demonstrates that there are no market prices of [crude palm

oil] due to market distortion. Comparing the respondents' distorted domestic purchase prices to similarly distorted domestic prices via a 'tier one' benchmark would not measure the extent of the distortion and, thus, the extent of the benefit."). That is, because Commerce found that the 2015 Export Levy had artificially lowered crude palm oil prices within Indonesia, it could not depend on those same prices to stand in for "adequate remuneration" when evaluating the prices of the subset of crude palm oil sales made to Wilmar and Musim Mas. Commerce then turned to the world market price for crude palm oil.

Plaintiffs argue that "Commerce has no such evidence of market distortion on the record, much less evidence of 'significant' market distortion. . . . Commerce simply assumed domestic sales were distorted based on pricing differentials with no basis in the statute or regulations for doing so." Pls.' Br. 44, 45. To bolster their arguments, Plaintiffs point to "substantial exports" of crude palm oil, a "large number of domestic suppliers competing for business," and claim that "[crude palm oil] prices in Indonesia are set by open bids and auctions on a daily basis. . . . Market participants in Indonesia are also free to sell their [crude palm oil] to domestic buyers, or export it." Pls.' Br. 45. Plaintiffs, then, would have Commerce use Indonesian domestic prices for crude palm oil as the benchmark for comparison with the allegedly cheaper prices at which Wilmar and Musim Mas purchased crude palm oil.

Substantial evidence, however, supports the Department's benchmark choice. After the 2015 Export Levy was enacted in July 2015, Indonesian crude palm oil prices frequently and sharply fell below world market prices, though they had often surpassed world market prices before July 2015. *See* Final IDM at 17; Pet.'s Rebuttal Br. at 23 tbl. 1 (summarizing Plaintiffs' submitted data). During the period of investigation, therefore (January 2016 to December 2016), the crude palm oil market in Indonesia experienced increased supply and lowered prices. *See*

Final IDM at 17. Although Plaintiffs propose alternative reasons for these changes, Commerce

reasonably concluded that the timing of the imposition of the 2015 Export Levy and the supply

and price change was not merely a coincidence. *See* Final IDM at 20 ("Our conclusion [that prices

were distorted] was not a theoretical assertion based solely on the 'alleged' effects, but was

instead an analysis of how and whether the price data on the record, discussed above and in the

*Preliminary Determination*, demonstrated a significant price differential between Indonesian and

global [crude palm oil] prices occurring alongside the implementation of the export levy.").

Therefore, the Department reasonably found that domestic prices were distorted, and turned to a

world price benchmark in accordance with the regulation.

### 3.   The 2015 Export Levy Was Sufficiently Specific for Purposes of the Statute

To constitute countervailable subsidies, both direct and indirect financial contributions

that benefit a recipient must also be "specific." *See* 19 U.S.C. § 1677(5)(A). The statute provides:

> Where there are reasons to believe that a [domestic] subsidy may be specific as a
> matter of fact, the subsidy is specific if one or more of the following factors exist:
>
> *(I) The actual recipients of the subsidy, whether considered on an enterprise or
> industry basis, are limited in number.*

19 U.S.C. § 1677(5A)(D)(iii) (emphasis added). The SAA additionally states that the specificity

analysis is intended to "avoid the imposition of countervailing duties in situations where, because

of the widespread availability *and use* of a subsidy, the benefit of the subsidy *is spread throughout

an economy*." SAA at 930, *as reprinted in* 1994 U.S.C.C.A.N. at 4242 (emphasis added).

The issue here is whether the indirect financial contribution, that is, the provision of goods

for less than adequate remuneration stemming from the 2015 Export Levy on crude palm oil, was

*de facto* specific. In its Final Determination, Commerce found that crude palm oil's usage was

limited to fourteen Indonesian industries, as identified by the Government of Indonesia. *See* Final

IDM at 19 (citing 19 U.S.C. § 1677(5A)(D)(iii)(I)).

Plaintiffs maintain that these fourteen industries are distinct and diverse from one

another,[18] and that Commerce "summarily decided that 14 industries is a 'limited' number," and

failed to "reveal against what standard the agency measured whether 14 users reflects a

sufficiently large number for *de facto* specificity purposes." Pls.' Br. 43. In Plaintiffs' view,

fourteen industries were too many to support a finding of specificity because the use of crude

palm oil was so widespread (from ice cream and margarine to fatty alcohol), and because the

relevant use—producing biodiesel—accounted for a relatively small percentage of crude palm oil

used in Indonesia. *See* Pls.' Br. 42 (citing Petition Exs., Vol. V.16 (Mar. 23, 2017), P.R. 21, at

Ex. CVD-IND-28) ("The record also shows that a relatively small amount of [crude palm

oil] is used for the production of biodiesel, as opposed to the many other uses of [crude palm

oil]. According to the WTO Trade Policy Review of Indonesia,[19] the use of [crude palm oil] for

biofuels represents less than 10 percent of total [crude palm oil] usage."). Plaintiffs thus argue

that the specificity standard was not met.

---

[18]     Supported by the Government of Indonesia's questionnaire response, Plaintiffs list
the fourteen industries as follows:

> (1) olein; (2) palm fatty acid distillates; (3) fatty acid; (4) monoglycerides,
> diglycerides, and triglycerides; (5) ice cream and margarine; (6) soap chip;
> (7) edible oil and salad oil; (8) biodiesel; (9) surfactant; (10) palmitate, stearate,
> oleate/glycol, and propylene glycol; (11) fatty amines; (12) fatty alcohol;
> (13) glycerol; and (14) food emulsifier.

Pls.' Br. 43 (citing GOI Initial Quest. Resp. at 73-74).

[19]     The most recent WTO Trade Policy Review of Indonesia, cited by Plaintiffs in their
brief, was published in 2013. *See* Trade Policy Review Body, *Report by the Secretariat: Indonesia*,
WTO Doc. TPR/S/278/Rev.1 (July 16, 2013).

Commerce justified its specificity determination, however, by finding that the number of industries benefitting from crude palm oil being provided for less than adequate remuneration did not "encompass all possible subsidy recipients within the economy of Indonesia." Final IDM at 19. In other words, Commerce complied with both the statute's requirement of *de facto* specificity, and the SAA's direction to avoid countervailing subsidies with a widespread benefit throughout an economy. The Department "recognize[d] that the nature of the products' uses as listed by the [Government of Indonesia] (food additives, soap, and biodiesel) are clearly not uses that would be beneficial to every industry within the Indonesian economy." Final IDM at 19; *see also* Prelim. Dec. Mem. at 16 ("Because only certain industries make use of [crude palm oil] . . . for the production of further processed products such as biodiesel, a limited number of enterprises and industries use this subsidy. . . . [The levy is therefore] *de facto* specific.").

The court finds that Commerce's specificity determination is both supported by substantial evidence and in accordance with law. The statute permits the Department to rely on a single factor, if need be, in finding that a subsidy is *de facto* specific. *See* 19 U.S.C. § 1677(5A)(D)(iii) ("[T]he subsidy is specific if one or more of the following factors exist . . .."). Commerce used the first of four factors, the "limited number of industries" factor, which required that "[t]he actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number." *Id.* § 1677(5A)(D)(iii)(I).

The law of specificity does not mandate that a subsidy be limited to the product under investigation, here, biodiesel. Rather, the law requires that the subsidy not be spread throughout the economy. *See, e.g.*, SAA at 930, *as reprinted in* 1994 U.S.C.C.A.N. at 4242 (emphasis added) ("The specificity test was intended to function as a rule of reason and to avoid the imposition of

countervailing duties in situations where, because of the widespread availability *and use* of a subsidy, the benefit of the subsidy is *spread throughout an economy*.").

The evidence before Commerce supported its specificity finding because the industries that used crude palm oil were sufficiently discrete and clearly defined subsets of the Indonesian economy. All parties agreed that the identified industries encompassed *all* usage of crude palm oil within the country. *See* Final IDM at 19; Pls.' Br. 43. Industries such as biodiesel or soap chip describe not widespread availability and use of a subsidized product, but rather, a finite list of identifiable, *actual* users of crude palm oil in Indonesia.

In other words, Commerce reasonably determined that the identified industries were sufficiently defined and limited for purposes of the statute, so as to escape a finding that the subsidy was widespread throughout the economy, and generally available and used. Accordingly, the court upholds the Department's specificity determination with regard to the 2015 Export Levy on crude palm oil.

### B.    Commerce's Subsidy Determination as to the 1994 Export Tariff Was Not Reasonable

In addition to its subsidy determination regarding the 2015 Export Levy on crude palm oil, Commerce also found that the 1994 Export Tariff on crude palm oil resulted in the same type of subsidy. Unlike the 2015 Export Levy, which is collected on all exports of crude palm oil, the 1994 Export Tariff was only collected if a threshold price per metric ton of crude palm oil was reached in a sale for export. *See* GOI Initial Quest. Resp., Ex. Pt. 13, at Ex. GOI-CPO-15.

Prior to and during the first part of the period of investigation, from October 2014 to May 2016, no export tariff revenue was collected on crude palm oil exports because the threshold price had not been reached. *See* GOI Initial Quest. Resp., Ex. Pt. 13, at Ex. GOI-CPO-15. From May 2016 to December 2016 (the end of the period of investigation), the threshold having been reached

for three of those months, a tariff of three dollars per metric ton was imposed. *See* GOI Initial

Quest. Resp., Ex. Pt. 13, at Ex. GOI-CPO-15. While the period during which the tariff was

collected was limited and the amount of the tariff collected was small, Commerce nonetheless

found the 1994 Export Tariff to be countervailable.

The Department's reasoning was that, since the tariff rate for crude palm oil increased

when export prices for crude palm oil increased, the Government of Indonesia intended to use the

tariff to keep crude palm oil in the country to increase the supply and lower the domestic sales

price. *See* Final IDM at 17-18 ("The fact that the [1994 Export Tariff] increases along with world

market prices further supports the conclusion that lowering domestic prices is an aim of the overall

regime.").

Commerce's subsidy determination is not supported by substantial evidence, nor is it in

accordance with law. Under the statute, Commerce must demonstrate, based on substantial

evidence, that the Government of Indonesia entrusted or directed crude palm oil sellers to make a

financial contribution that was otherwise countervailable. *See* 19 U.S.C. § 1677(5)(B)(iii). Here,

Commerce failed to make an independent financial contribution finding with respect to the 1994

Export Tariff. Rather, Commerce justified its subsidy determination using the same reasoning it

applied to the 2015 Export Levy, and relied on evidence related to the 2015 Export Levy rather

than the 1994 Export Tariff. *See* Final IDM at 17-18 (discussing how the Indonesian price for

crude palm oil dropped after the implementation of the 2015 Export Levy). Therefore, Commerce

cites no evidence tending to demonstrate that the 1994 Export Tariff, independently, resulted in

cheap crude palm oil.

Also, under the statute, it was not sufficient for Commerce to demonstrate with substantial

evidence that the underlying *intention* of the 1994 Export Tariff was to provide biodiesel producers

with cheaper crude palm oil. Rather, Commerce was required to show that crude palm oil, a good, was provided for less than adequate remuneration—*i.e.*, that the Government of Indonesia used the 1994 Export Tariff to make a financial contribution to Wilmar and Musim Mas. Therefore, Commerce's subsidy determination was not in accordance with law because the Department applied the wrong legal standard. That is, intention is not enough; evidence of an actual financial contribution is required.

Commerce failed to support a subsidy determination because it pointed to no compelling evidence of lower crude palm oil prices in Indonesia, connected to the 1994 Export Tariff. Indeed, it acknowledged that, during the period of investigation, the 1994 Export Tariff barely had an effect. *See* Final IDM at 17 ("[T]he [export tariff] was very low during the [period of investigation] ($0 or $3 [per metric ton])."). Yet, Commerce still made a subsidy determination with respect to the 1994 Export Tariff, claiming that it was part of Indonesia's overall "aim" of supporting the biodiesel industry, and relying on evidence related to the 2015 Export Levy. *See* Final IDM at 17, 18 (emphasis added) ("The export taxes and levies ensure that the private [crude palm oil] producers [provide cheaper crude palm oil to biodiesel producers]. From October 2014 through June 2015, after deducting freight expenses, the price of [crude palm oil] was always higher in Indonesia than it was on the world market. In July 2015, *when the [2015 Export Levy] was implemented*, prices of [crude palm oil] in Indonesia dropped well below world market prices for 15 out of the next 18 months."). But evidence of the 2015 Export Levy is not relevant here, and Commerce cannot rely on it without a reason for doing so. Commerce points to no evidence that the 1994 Export Tariff, separate from the 2015 Export Levy, yielded financial contributions to Wilmar and Musim Mas in the form of goods provided for less than adequate remuneration.

Therefore, the court remands the Department's subsidy determination with regard to the 1994 Export Tariff. To the extent that Commerce attributed the alleged effects of the 1994 Export Tariff to Wilmar's and Musim Mas' sales during the period of investigation, the court directs the Department to recalculate its ad valorem subsidy rates for this program.

## CONCLUSION and ORDER

Commerce's Final Determination that the Government of Indonesia's 1994 Export Tariff constituted a countervailable subsidy is neither supported by substantial evidence nor in accordance with law. Therefore, it is hereby

**ORDERED** that the Final Determination is sustained in part and remanded; it is further

**ORDERED** that, on remand, Commerce issue a revised Final Determination that complies in all respects with this Opinion and Order, is based on determinations that are supported by substantial record evidence, and is in all respects in accordance with law; it is further

**ORDERED** that Commerce shall make a new subsidy determination as to the 1994 Export Tariff that is supported by substantial evidence and in accordance with law; or, in the alternative, recalculate its ad valorem subsidy rate for goods provided for less than adequate remuneration, excluding any claimed effects of the 1994 Export Tariff; and it is further

**ORDERED** that the revised Final Determination shall be due ninety (90) days following the date of this Opinion and Order; any comments to the revised Final Determination shall be due thirty (30) days following the filing of the revised Final Determination; and any responses to those comments shall be filed fifteen (15) days following the filing of the comments.

   /s/ Richard K. Eaton   
Richard K. Eaton, Judge

Dated: August 11, 2020
     New York, New York